IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

LALLYMAY ROSE-BURRELL,            *

    Plaintiff,                 *

vs.                               *

                          CASE NO. 3:24-CV-11 (CDL)

CITY OF MONROE, NICHOLAS          *
SILVERBERG, AND RYAN GEE,
                                  *
    Defendants.
_____ *

O R D E R

City of Monroe police officers Ryan Gee and Nicholas Silverberg responded to a report of a suicide attempt at a care home operated by Lallymay Rose-Burrell. When the officers arrived at the home, the resident was no longer actively attempting suicide. The resident and the caregiver on duty both reported that the resident was supposed to be on daily psychiatric medicines but had not received them. Rose-Burrell was not at the home when the officers responded. She did speak with Silverberg on the phone and told him that the resident was getting his medication, but she did not know where the staff put it. Based on his observations at the home, his interviews of the people there, and his discussion with Silverberg, Gee concluded that the resident had not received his medication and that his suicide attempt was connected to his lack of psychiatric medication. Gee decided to obtain arrest warrants against Rose-Burrell for neglecting and exploiting a

disabled person by depriving him of psychiatric medication.   Gee later arrested Rose-Burrell pursuant to those warrants.   The charges were ultimately dismissed.

Rose-Burrell brought this action against Gee and Silverberg in their individual capacities under 42 U.S.C. § 1983 for violations of her Fourth Amendment rights.   She also asserts state law claims against Gee, Silverberg, and the City of Monroe. Defendants moved for summary judgment on all of Rose-Burrell's claims.   For the reasons set forth below, the Court grants the summary judgment motion (ECF Nos. 14 & 17) as to Rose-Burrell's § 1983 claims and declines to exercise supplemental jurisdiction over her state law claims.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).   A fact is *material* if it is relevant or necessary to the outcome of the suit.   *Id.* at 248.   A factual dispute is *genuine* if

the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

The parties rely on four video exhibits, which they agree contain the information the officers used to make a probable cause determination.   The Court reviewed the videos.   The Court recognizes that it "must construe all ambiguities in the video footage in favor of" Rose-Burrell, but "where a video is clear," the Court must "accept the video's depiction . . . and view the facts in the light depicted by the video."  *Baker v. City of Madison*, 67 F.4th 1268, 1277–78 (11th Cir. 2023).

FACTUAL BACKGROUND

Lallymay Rose-Burrell is a nurse who operates a personal care home called Anddinn's Home in Monroe, Georgia (the "Home").   The Home is a residential-type personal care home that houses residents with significant health issues.   The Home's staff provides residents with food, daily living assistance, and medications. Two caregivers lived onsite at the Home: Rassulaiyman Nyahbinghi ("Rah") and Kideshia Dent.   Rah was the primary caregiver for the four residents on weekdays, and Dent provided care for the four residents on weekends.

## I.   John Doe's Arrival at the Home and Suicide Attempt

On June 8, 2022, a new resident "John Doe" was discharged from a hospital to the Home.   Doe was sixty-four years old and had been hospitalized following a suicide attempt during which he cut

his wrists.  He was diagnosed with schizophrenia.  Rose-Burrell knew about the suicide attempt and the schizophrenia diagnosis when Doe was transferred to the Home.  Rose-Burrell also knew that it was important for Doe to receive his daily medication to manage his psychiatric condition because failure to take the medication could trigger Doe's psychosis.  The Home was responsible for obtaining medication for Doe.  Rose-Burrell was the person at the Home who got residents' prescriptions issued and filled.  Rose-Burrell Dep. 51:18-52:25, ECF No. 19.

Dent was on duty on Saturday, July 2, 2022.  She noticed that Doe began acting strangely to the point that she became scared and decided that she needed to keep her "guard up."  Dent Dep. 23:22-24:5, 25:10-25, ECF No. 18.  On Sunday, July 3, 2022, Dent went into the Home's kitchen and saw Doe with a knife, threatening to harm himself.  Dent called Rose-Burrell, who told Dent to try and get the knife away from Doe and then call the police.  When Dent tried to get the knife away from Doe, he acted like he was going to stab her, but Dent was eventually able to snatch the knife out of Doe's hand and get it away from him.

Rose-Burrell called 911 to request an ambulance.  She gave the address for the Home and described it as a "private home." Rose-Burrell Dep. Ex. A, 911 Audio Call 00:06-00:32 (on file with the Court).  She told the dispatcher, "I have someone trying to kill himself."  *Id.* at 00:33-00:37.  Rose-Burrell explained that

the person had a knife and was trying to cut his wrists. *Id.* at
00:37-00:49. When the dispatcher asked about Rose-Burrell's
relationship to the person, Rose-Burrell responded, "I just go to
the home" to take care of him. *Id.* at 1:27-1:37. The dispatcher
asked if the person was being aggressive to Rose-Burrell, who
responded, "No, not being aggressive now, but he was trying to
hurt himself." *Id.* at 1:47-1:55. Rose-Burrell did not identify
herself as the owner of the Home or inform the dispatcher that she
was not at the Home.

## II. The Officers' Response to the Suicide Attempt Call

Monroe police officer Ryan Gee and his shift supervisor
Nicholas Silverberg responded to the 911 call, along with several
paramedics. They knew that they were responding to a report that
a person was actively attempting suicide. When the officers
arrived at the Home, Dent was outside. Gee Dep. Ex. 4, Gee Body
Cam Video 1, 15:14:31-15:14:32 (on file with the Court). Dent
informed them that Doe was in his room lying down and that he no
longer had the knife. Gee Dep. Ex. 5, Silverberg Body Cam Video
1, 15:14:32-15:14:40 (on file with the Court). Dent led the
officers into the Home and showed them where Doe's room was, and
she explained that Doe had a history of suicide attempts. *Id.* at
15:14:50-15:14:55. The officers talked with Doe, who was calm and
in his bed. Gee asked Doe if he was trying to kill himself, and
Doe responded "I was thinking about it. I ain't done it yet."

Gee Body Cam Video 1, 15:15:40-15:15:47.  Doe showed Silverberg his arm where he had previously cut himself, and said "I'll do it now . . . I'm sick."  Silverberg Body Cam Video 1 at 15:15:40-15:15:58.  Silverberg asked if Doe wanted to go to the hospital, and Doe said yes.  Silverberg left Doe's room and walked outside. On the way, he asked Dent who ran the Home, and she replied that it was her boss, Rose-Burrell.

Gee took three paramedics into Doe's room, and they asked Doe what was going on.  Doe responded, "This place is rough" and said he "can't get" his medications because "they won't give it—they ran out and they won't give it."  Gee Body Cam Video 1, 15:17:36-15:17:48.  Gee asked, "They're not giving you your medicine?" and Doe responded no.  *Id.* at 15:17:49-15:17:51.  Gee asked Dent, "he's not getting any medicine?"  *Id.* at 15:18:00-15:18:01.  Dent responded that Doe had a "PRN" medication that he took "as needed," and she showed the medication to Gee.  *Id.* at 15:18:02-15:18:27. Gee later asked one of the EMTs what the PRN medication was for, and the EMT said it was a non-narcotic pain medication.  *Id.* at 15:24:58-15:25:01.  Dent also told Gee that she was "just alerted" that Doe took daily medication and that she had not previously been aware that Doe took daily medication "because it wasn't sat out" for her to see.  *Id.* at 15:18:02-15:18:27.  Gee asked Doe what his daily medication was for, and Doe responded that it was for "anxiety and all kinds of mental things."  *Id.* at 15:19:24-

15:19:32.  A paramedic took Doe's blood pressure, reported that it was high (150/98), and asked Doe if he usually had high blood pressure.  Doe said that he did take blood pressure medication but could not remember the last time he took it.  *Id.* at 15:20:20-15:20:50.  Doe also told the paramedic that he was diabetic.  *Id.* at 15:20:50-15:20:58.[1]  A paramedic asked Dent if she had a sheet on Doe with his information, and Dent responded that she needed to call her boss.  *Id.* at 15:21:05-15:21:12.

Gee went outside and reported to Silverberg: "He's been here for days, and nobody's given him any medicine.  [Dent] just told me.  [Dent is] not giving him medicine.  [Dent] didn't know he was supposed to have it."  *Id.* at 15:21:30-15:21:40.  Silverberg questioned whether Dent had "any medical training whatsoever." *Id.* at 15:21:40-15:21:42.  Gee told Silverberg, "He's diabetic, he's supposed to be taking all kinds of psychotic medications, he's getting nothing.  Blood pressure medicine, not getting, his blood pressure's elevated."  *Id.* at 15:21:45-15:21:55.

Silverberg went back into the Home, and Dent was on speakerphone with Rose-Burrell.  Silverberg asked to speak with Rose-Burrell, and Dent handed him the phone.  Rose-Burrell stated that Rah, the weekday caregiver, was "not there" and she did not

---

[1] Rose-Burrell asserts that she was not aware that Doe had a history of high blood pressure or diabetes, and she contends that she did not know Doe had any prescribed medications for those conditions.

know "where he's putting the stuff." Gee Dep. Ex. 6, Silverberg Body Cam Video 2, 15:22:13-15:22:17 (on file with the Court). Rose-Burrell stated that Doe had a "history" and came to the Home from a "psych facility." *Id.* at 15:22:17-15:22:21. Silverberg asked Rose-Burrell if she knew where Doe's "medical stuff" was, and she said, "you are talking about his folder for the Home. The staff that works Monday through Friday, if [Dent] doesn't see it, I don't know where [Rah] put it. I've been calling him and he's not answering." *Id.* at 15:22:27-15:22:44. Rose-Burrell repeated that Doe "does have a history" and stated that "he's on psych medication." *Id.* at 15:22:45-15:22:49. Silverberg said, "But he's not getting his medication, from what we're being told." *Id.* at 15:22:50-15:22:52. Rose-Burrell responded, "He is getting his meds. I just don't know where the staff put it." *Id.* at 15:22:53-15:22-57. Silverberg did not ask where the records and medication were usually kept, and Rose-Burrell did not say. Rose-Burrell said that she had been "there yesterday" and that she told someone to "go back through the things to put it in the cabinet." *Id.* at 15:22:58-15:23:06. Rose-Burrell repeated that Doe had a history of suicidal ideation and that he had "an attempt a few months ago." *Id.* at 15:23:12-15:23:19. She did not state that she had personally given Doe any medication on Friday or Saturday.

Silverberg told Rose-Burrell that he would talk with Dent, then take Doe to the hospital. Rose-Burrell said that Dent

"wouldn't know much because she's only there on Saturdays and Sundays," then Rose-Burrell stated that she was "trying to get there" but was "far away, like forty-five minutes away." *Id.* at 15:23:29-15:23:38.  Silverberg responded that it "seems to be a common problem every time something like this happens in any of these," then he told Rose-Burrell he would talk with Dent to get as much information as he could; Rose-Burrell said "all right," and Silverberg ended the call. *Id.* at 15:23:38-15:23:49.  While Silverberg was on the telephone with Rose-Burrell, Dent looked in at least the top drawer of a file cabinet, on top of a desk, and through the drawers of the desk. Gee Body Cam Video 1, 15:22:59-15:23:05; Silverberg Body Cam Video 2, 15:22:23-15:23:11.  Dent did not alert the officers to anything she saw in the drawers. The officers saw Dent "actively looking" through the drawers and "couldn't find anything."  Gee Dep. 79:11-18, ECF No. 20.

After the phone call with Rose-Burrell, Gee walked around the first floor of the Home, looking in another resident's bedroom, the living room, Doe's room, and a bathroom.  Meanwhile, Silverberg asked Dent about her employment at the Home and whether she had any medical training.  Dent said that she did not have any medical training, and she reiterated that she was not aware that Doe had daily medication.  Silverberg Body Cam Video 2, 15:23:50-15:24:49.  Gee told Dent, "it's not fair to you to be in charge of people if you don't know what you're doing."  Gee Body Cam Video 1, 15:23:57-

15:24:00.  A paramedic asked Dent again what kind of medications Doe was supposed to take and if she had an information sheet for Doe.  Dent responded that she only worked Saturday and Sunday and that the person who worked Monday through Friday was off.  *Id.* at 15:25:17-15:25:28.  Gee told her, "Don't get nervous.  You're not in any trouble.  Nobody should put you here if you don't know what's going on . . . . It's not your fault."  *Id.* at 15:25:28-15:25:38.  Dent repeated that she "wasn't aware that [Doe] was taking any medication."  *Id.* at 15:25:39-15:25:43.  Gee walked outside.

Silverberg spoke to another resident, then walked outside and reported to Gee that the other resident said the staff took good care of him.  Gee went back into the Home to get a copy of Dent's identification; he waited in the living room while she went upstairs to get it.  Gee Dep. Ex. 7, Gee Body Cam Video 2 15:30:56-15:31:48 (on file with the Court).  As Gee left the Home, Dent said that she was "sorry if it was a waste of [his] time."  *Id.* at 15:31:51-15:31:53.  Gee replied that it was not a waste of his time but said: "These health care homes like this, they're not doing what they're supposed to be doing."  *Id.* at 15:31:54-15:32:00.  Dent said, "I already know."  *Id.* at 15:32:02-15:32:03.  The paramedics removed Doe from the Home and took him to the hospital.  The officers and paramedics were at the Home approximately thirty minutes.

**III. The Arrest Warrant and Arrest**

Based on what Doe, Dent, and Rose-Burrell said, Gee and Silverberg learned that Doe had a history of suicidal ideation, had attempted suicide a few months prior, came to the Home from a psychiatric facility, "was supposed to be on psychiatric medication," and had expressed a "suicidal ideation" shortly before officers arrived at the Home. Gee Dep. 38:22-39:5; *accord* Silverberg Body Cam Video 2, 15:22:17-15:23:19 (Rose-Burrell giving Doe's history). Since Dent was the only caregiver on site, Gee concluded that Dent "was in charge of providing [Doe] with [his] medicine." Gee Dep. 23:5-11. And based on what Dent and Doe told him, Gee determined that Doe had "possibly" not received his required psychiatric medication on Friday night, then had not received it on Saturday or Sunday. *Id.* at 23:12-15. Given these circumstances, Gee did not believe Rose-Burrell when she said that Doe was getting his medication. *Id.* at 76:25-77:20. Gee presumed that Doe had attempted suicide earlier in the day because he had not received his required psychiatric medicine. *Id.* at 38:22-39:10. Gee thought that if Dent was in charge of the Home on weekends, she should know what required medications each resident had, but she "didn't even know about it." *Id.* at 23:5-11, 35:19-23. Gee concluded that Rose-Burrell "left somebody in charge of the residents that was not able to care for them properly or

provide the correct medications which she didn't even know . . . that he was even supposed to have." *Id.* at 60:21-61:1.

On July 4, 2022, Gee completed arrest warrant affidavits against Rose-Burrell for violations of two criminal statutes: O.C.G.A. § 16-5-102(a) (exploitation of disabled adults) and O.C.G.A. § 16-5-101 (neglect of a disabled adult). In both affidavits, Gee stated that Rose-Burrell was the "owner of a licensed personal care home and the person supervising the welfare and having immediate charge, control, and custody of [Doe], who is by definition mentally or physically incapacitated by being a resident of the facility." Gee Dep. Ex. 11, Warrant No. 2022-2001, ECF No. 20-11; Gee Dep. Ex. 12, Warrant No. 2022-2000, ECF No. 20-12. In the first affidavit, Gee stated that Rose-Burrell deprived Doe of "essential services by not providing [Doe with] psychiatric medicine," and that because she failed to provide Doe with "prescribed psychotic medication," Doe "was caused mental anguish." Warrant No. 2022-2001. In the second affidavit, Gee stated that Rose-Burrell deprived Doe of "medical care by depriving [him] of prescribed medication" and that because Rose-Burrell failed "to provide prescribed psychotic medication, [Doe] developed suicidal thoughts." Warrant No. 2022-2000. A magistrate judge determined that the facts set forth in the affidavits supported probable cause for the charged offenses, and she signed the arrest warrants without eliciting testimony from Gee.

Gee later arrested Rose-Burrell pursuant to the arrest warrants. She was booked into the county jail, where she stayed until she was released on bond following an initial appearance before a magistrate judge. The State later dismissed the charges without prejudice for insufficient evidence. In the notice of dismissal, the assistant district attorney stated, "The investigation done by the Monroe Police Department was incomplete, and did not provide sufficient evidence to support an arrest warrant, let alone a conviction." Gee Dep. Ex. 13, Notice of Warrant Dismissal, ECF No. 20-13.

## DISCUSSION

Rose-Burrell asserts claims against Gee and Silverberg under 42 U.S.C. § 1983, arguing that the officers violated her Fourth Amendment rights. Gee and Silverberg contend that they are entitled to qualified immunity on the Fourth Amendment claims. "Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020) (quoting *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019)). Where, as here, it is undisputed that an officer was acting within his discretionary authority at the time of the challenged actions, the plaintiff must show that "qualified immunity is not appropriate." *Paez v. Mulvey*, 915 F.3d 1276, 1284 (11th Cir.

2019).  Officers are "entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *Williams*, 965 F.3d at 1156 (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018)).

Rose-Burrell argues that Gee and Silverberg violated her clearly established right under the Fourth Amendment to be free from an unreasonable seizure as a result of malicious prosecution.[2] To establish such a claim, Rose-Burrell "must prove both '(1) the elements of the common-law tort of malicious prosecution and (2) a violation of [her] Fourth Amendment right to be free from unreasonable seizures.'" *Butler v. Smith*, 85 F.4th 1102, 1111 (11th Cir. 2023) (quoting *Blue v. Lopez*, 901 F.3d 1352, 1357 (11th Cir. 2018)).  When a defendant asserts qualified immunity to a Fourth Amendment malicious prosecution claim, the plaintiff must prove seven elements: (1) a criminal prosecution instituted by the

---

[2]  In her complaint, Rose-Burrell states that her Fourth Amendment claims are for false arrest and false imprisonment, but she acknowledges that because she was arrested pursuant to a warrant, her Fourth Amendment claim should be construed as a malicious prosecution claim.  *See Williams*, 965 F.3d at 1158 ("A claim of false arrest or imprisonment under the Fourth Amendment concerns seizures without legal process, such as warrantless arrests. . . . Malicious prosecution, in contrast, requires a seizure 'pursuant to legal process.'") (quoting *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016)).  Despite Rose-Burrell's characterization of her claims in the complaint, the Court is satisfied that Rose-Burrell alleged facts that put Defendants on notice that she was asserting a Fourth Amendment malicious prosecution claim—which Defendants acknowledged by construing her Fourth Amendment claims as a malicious prosecution claim.  Her motion for leave to amend the complaint to add a malicious prosecution claim (ECF No. 25) is terminated as moot.

present defendant, (2) the defendant acted with malice and without probable cause, (3) the prosecution terminated in the plaintiff accused's favor, (4) the prosecution caused damage to the plaintiff accused, (5) the legal process justifying the plaintiff accused's seizure was constitutionally infirm, (6) the seizure would not otherwise be justified without legal process, and (7) the law was clearly established. *Id.* at 1111-12.

The only elements that are seriously disputed here are (2) and (5), which "effectively" merge together, so the Court may focus simply on whether the legal process justifying Rose-Burrell's seizure "was constitutionally infirm." *Id.* at 1112 (quoting *Williams*, 965 F.3d at 1165). A plaintiff can prove that the arrest warrant was "constitutionally infirm" by demonstrating that the officer "intentionally or recklessly made misstatements or omissions necessary to support the warrant." *Id.* (quoting *Williams*, 965 F.3d at 1165). It "was and is clearly established that intentionally or recklessly omitting material information from a warrant affidavit violates the Fourth Amendment." *Id.*. The Court must determine whether Rose-Burrell pointed to enough evidence to create a genuine fact dispute on whether Gee made material misstatements or omissions in the arrest warrant affidavit.

A warrant affidavit must contain truthful statements that establish probable cause for an offense, and an "affidavit's

omissions may lead to an unreasonable and unconstitutional warrant-based arrest *if* information that the affiant knew about but intentionally or recklessly disregarded negates a finding of probable cause." *Paez*, 915 F.3d at 1287. But officers are entitled to qualified immunity if they had arguable probable cause for an arrest. "The arguable-probable-cause standard asks whether a 'reasonable officer[] in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed.'" *Butler*, 85 F.4th at 1116 (alteration in original) (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004)). This standard "protects officers who 'reasonably but mistakenly conclude that probable cause is present.'" *Id.* (quoting *Holmes v. Kucynda*, 321 F.3d 1069, 1079 (11th Cir. 2003)(quotations marks omitted)). Probable cause "exists when the facts, considering the totality of the circumstances and viewed from the perspective of a reasonable officer, establish 'a probability or substantial chance of criminal activity.'" *Washington v. Howard*, 25 F.4th 891, 898-99 (11th Cir. 2022) (quoting *Wesby*, 583 U.S. at 57). "Probable cause does not require conclusive evidence and 'is not a high bar.'" *Id.* at 899 (quoting *Wesby*, 583 U.S. at 57). The Court "must simply ask 'whether a reasonable officer *could* conclude . . . that there was a substantial chance of criminal activity.'" *Id.* (alteration in original) (quoting *Wesby*, 583 U.S. at 60).

16

In evaluating whether arguable probable cause existed for purposes of a malicious prosecution claim based on an allegedly misleading arrest warrant, the Court may "consider only (1) the information that was before the magistrate [in Officer Gee's search warrant affidavit] . . . minus (2) any material misstatements that [Gee] might have made, plus (3) any material information that [Gee] omitted from [his] affidavits." *Butler*, 85 F.4th at 1113.  If the affidavit, *with* the omitted material information and *without* any material misstatement, would have established probable cause, then the malicious prosecution claim fails.  *Paez*, 915 F.3d at 1288.  Given the summary judgment posture, the Court must credit Rose-Burrell's evidence and draw factual inferences in her favor, but the Court is not permitted to draw inferences that are not supported by the undisputed facts.

Here, Rose-Burrell does not argue that the arrest warrant affidavits, on their face, fail to establish probable cause for abuse and exploitation of a disabled person.  She also does not appear to dispute that Doe was a disabled person, that she had immediate charge, control and custody of Doe, or that she was obligated to provide Doe with psychiatric medication.  And, she does not deny that arguable probable cause would exist to arrest her on the two charges if the officers had evidence to support the conclusion that she deprived Doe of his psychiatric medicine and he suffered suicidal thoughts as a result.  She contends, though,

17

that these statements were material misrepresentations because no reasonable officer could have concluded that she deprived Doe of his psychiatric medication.

According to Rose-Burrell, if the officers had conducted a reasonable investigation of her side of the story and reviewed readily discoverable evidence, they would have learned facts that undermined their probable cause determination.  She suggests that the officers should be charged with knowledge of these facts and that the arrest warrant affidavits would not have established probable cause with the omitted facts.  Specifically, Rose-Burrell contends that the officers should be charged with knowledge of what she would have said, had the officers interviewed her in person and what the officers would have seen, had she been given an opportunity to show them Doe's medical file.  Rose-Burrell argues that with this additional information, no reasonable officer or magistrate would have concluded that there was probable cause to arrest her for exploitation or neglect of a disabled person.

Rose-Burrell asserts that Gee unreasonably omitted from his arrest warrant affidavit (1) her statement that Doe was getting his medication, (2) her statement that she was willing to come to the Home to find Doe's medication and medical chart, (3) evidence

that Rose-Burrell tried to refill Doe's medication, and (4) evidence that Doe only missed a day or two of medication.[3]

Regarding the first omission—Rose-Burrell's statement that Doe was getting his medication—Gee did not include the statement in his affidavit because he did not believe it. In deciding whether probable cause exists, an arresting officer is "not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for believing that an offense has been committed." *Paez*, 915 F.3d at 1286 (quoting *Dahl v. Holley*, 312 F.3d 1228, 1234 (11th Cir. 2002)). "So long as it is reasonable to conclude from the body of evidence as a whole that a crime was committed, the presence of some conflicting evidence or a possible defense will not vitiate a finding of probable cause." *Id.* Here, the information that the officers gathered supported their conclusion that Doe was not receiving his required medication, despite Rose-Burrell's statement to the contrary. Moreover, as discussed in more detail below, the evidence Rose-Burrell insists the officers should have reviewed supports the conclusion that Doe

---

[3] Rose-Burrell also argues that the affidavit should have stated that Doe had schizophrenia and had been transferred to the Home from a psychiatric facility with a history of suicidal ideation. From this information, it is reasonable to conclude that it was critical for Doe to receive psychiatric medication and that failing to give it to him could result in harm. Thus, it is not clear to the Court how this information would militate against a finding of probable cause for exploitation and neglect of a disabled person.

did not actually receive all of his required medication during his stay at the Home.[4]

Rose-Burrell argues that if the officers had interviewed her, she would have (1) shown them Doe's medications and the medical charts documenting that Doe received his required medicatons, (2) told them that she personally administered Doe's psychiatric medications on July 1 and July 2, and (3) stated that she did not know that Doe was out of his psychiatric medications but that she had tried to get him more medication. Rose-Burrell did not point to any evidence that she would have been able to show the officers any psychiatric medication for Doe. Based on her own testimony, she believes she gave Doe the last pills on July 2. Rose-Burrell Dep. 57:24-59:12. As to the medication records which Rose-Burrell says the officers should have inspected, they do not show that Doe received all his required medications while he was at the Home.

When Doe was discharged from the hospital and sent to the Home on June 8, 2022, Rose-Burrell filled a fifteen-day prescription for his two psychiatric medicines—an antipsychotic medicine with two doses per day (30 pills) and an antidepressant with one dose per day (15 pills). Rose-Burrell Dep. 25:24-26:24,

---

[4] Rose-Burrell appears to argue that the officers should have credited her statement over Dent's statement because if the officers had interviewed her, she would have told them that Dent was lying when she said she did not know about Doe's medications. Without any other evidence about Doe's medications, this information might have caused a reasonable officer to doubt Dent's credibility. But this information did not exist in a vacuum.

37:2-14, 40:8-23; *accord* Defs.' Mot. Summ. J. Ex. I, Prescription Record, ECF No. 17-7.  According to Rose-Burrell, Doe received his medication from that prescription from June 8 to June 22.  Rose-Burrell Dep. 26:7-11; *accord* Rose-Burrell Dep. Ex. 17 at Rose-Burrell-000199, Medicine Administration Record, ECF No. 19-8 at 2 (showing initials "RN" for one morning dose and one evening dose of the antipsychotic medication and one dose of the antidepressant each day between June 8 and June 22).  Based on the prescription information, the medication chart, and Rose-Burrell's testimony (citing the medication chart), Doe received all of his required psychiatric medication from June 8 to June 22.

But for June 23 to July 3, there are obvious discrepancies between the medication charts and the available number of pills. It is undisputed that Rose-Burrell did not procure any additional medication for Doe after she got his prescriptions filled on June 8.  Doe received the last of the medication from those prescriptions on June 22.  According to Rose-Burrell, beginning on June 23, the caregivers used the two bottles of psychiatric medication that Doe received from the hospital, each of which contained a five-day supply.  Rose-Burrell Dep. 37:2-14, 40:16-23; *accord* Rose-Burrell Dep. Ex. 17 at Rose-Burrell-000213, Photo of Prescription Label, ECF No. 19-8 at 16 (ten pills of antipsychotic medication); Rose-Burrell Dep. Ex. 17 at Rose-Burrell-000214, Photo of Prescription Label, ECF No. 19-8 at 17

(five pills of antidepressant). That would have provided enough medication for Doe's required doses through June 27.

According to the medication chart, "R.N." signed to indicate that Doe received the daily dose of the antidepressant for each day from June 23 to June 30—even though there were only five pills available for those eight days. Rose-Burrell Dep. Ex. 17 at Rose-Burrell-000200, Medication Chart, ECF No. 19-8 at 3. "R.N." also signed the chart for the morning dose only of the antipsychotic medicine for June 23 to June 30, with no initials for the evening dose for those dates. Rose-Burrell Dep. Ex. 17 at Rose-Burrell-000200, Medication Chart, ECF No. 19-8 at 3. Rose-Burrell contends that the lack of initials does not mean that the medication was not given: "It just means they did not sign." Rose-Burrell Dep. 23:15-24:2. She also testified that it was not her experience to give half the daily dosage if the patient was running low on a medication. *Id.* at 24:3-7. But there were simply not enough pills for R.N. to have given Doe both antipsychotic pills every day between June 23 and June 30.

If "R.N." gave both doses of the antipsychotic medicine (but only signed for the morning dose), the ten pills would have lasted through June 27. If "R.N." only gave the morning dose from June 23 to June 30, there would have been two pills left by July 1. But Rose-Burrell testified—and presumably would have told the officers—that she gave Doe his morning and evening doses of the

22

antipsychotic medication on July 1 and 2 (four pills), as well as his evening dose of the antidepressant (two pills).  Rose-Burrell Dep. 24:17-25:1; *accord* Rose-Burrell Dep. Ex. 17 at Rose-Burrell-000201, Medication Chart, ECF No. 19-8 at 4 (showing initials "LR" for one morning dose and one evening dose of the antipsychotic medication and one dose of the antidepressant on July 1 and July 2).  She also testified that when she went to give Doe his medication on July 1, there were only three tablets of the antipsychotic medicine and two tablets of the antidepressant, so the bottles were empty as of July 2.  Rose-Burrell Dep. 57:24-59:12.

The takeaway: even if a reasonable officer believed Rose-Burrell's statement that she gave Doe his medication on July 1 and July 2, simple arithmetic shows that there were not enough pills for Doe to have received all the required doses of his psychiatric medicine during his stay at the Home.  If Rose-Burrell gave Doe four pills of the antipsychotic medication on July 1 and July 2, then the other caregivers could have only provided him with six of the sixteen required doses between June 23 and June 30.  If she gave Doe two pills of the antidepressant on July 1 and July 2, then the other caregivers could have only provided him with three of the eight required doses between June 23 and June 30.  And Rose-Burrell admits that Doe was out of psychiatric medication by July 2.  So, even considering the omitted facts, Doe's and Dent's

statements to the officers on July 3 were objectively true. Doe did not get all of his required psychiatric medication, and the Home was out of his medication.

Rose-Burrell also suggests that if she had been interviewed, she would have explained that she did not know Doe was running low on his medication and that she was trying to get him more medication. *See* Rose-Burrell Aff. ¶ 12, ECF No. 23-3 ("I was unaware of any claim that he was out of his medications."). Again, though, Rose-Burrell testified that the pills were out by July 2, which she knew because she personally gave Doe the last few pills. Rose-Burrell Dep. 57:24-59:12. From that, a reasonable officer would not have been required to believe Rose-Burrell's contention that she did not know that Doe was running low on or was out of medication. As to Rose-Burrell's assertion that she was trying to get Doe more medicine, it is undisputed that Rose-Burrell was the person responsible for getting Doe's medication. Based on the medication records that she says the officers should have reviewed, Rose-Burrell knew that after June 22, Doe only had enough medication for five days. Rose-Burrell asserts that she called a mobile medical service two times before the end of June to ask for a doctor to come see Doe and prescribe additional medication, but she did not hear back from the service, and no doctor was scheduled to come see Doe. Rose-Burrell Dep. 52:21-54:15. In summary, the evidence supports the conclusion that Rose-Burrell knew that Doe

needed more psychiatric medication, made two phone calls to try to schedule a doctor's appointment for Doe, then took no further action.[5] These omitted facts do not vitiate probable cause.

Finally, Rose-Burrell faults the officers for not trying to review Doe's medical records. Had the officers been able to get a copy of Doe's medical records from his most recent hospitalization, they would have learned that he was admitted to the hospital after cutting himself with a razor in a suicide attempt, he had a history of self-injurious behavior with razors, he was diagnosed with schizophrenia, and he was discharged with one antipsychotic medication to be taken twice a day and one antidepressant to be taken at bedtime. Defs.' Mot. Summ. J. Ex. G, Hospital Discharge Summary 1-2, ECF No. 17-5. The officers would have also learned that Doe was scheduled for a "follow up" with a "medication management provider" on June 15, 2022 and a therapist on June 13, 2022. *Id.*[6] It is undisputed that no one

---

[5] According to Rose-Burrell, there was "no other option" but to wait for the mobile medical service to schedule an appointment for Doe because she had no insurance information for him, although she did not clearly explain why she only called twice if it was the only option for making sure that Doe got his required psychiatric medications. Rose-Burrell Dep. 55:4-57:12.

[6] Although Rose-Burrell contends that the officers should have reviewed a copy of this record, she asserts that she did not receive it or know about the two appointments. Rose-Burrell Aff. ¶ 13. The Court notes that Exhibit 17 to Rose-Burrell's deposition contains a different, handwritten discharge summary that states that Doe was being discharged to the Home. Rose-Burrell Dep. Ex. 17 at ROSE-BURRELL-000209, ECF No. 19-8 at 12. The document lists the two follow-up appointments for Doe. *Id.* It is not clear from the present record whether Bates No. ROSE-BURRELL-000209 was a page from Doe's medical records at the Home, though other pages of Exhibit 17 are from the Home's files.

took Doe to the two follow-up appointments.  This information would not have militated against a probable cause determination.

In summary, Rose-Burrell did not point to any "concrete evidence that obviously and definitively rules out probable cause." *Davis v. City of Apopka*, 78 F.4th 1326, 1343 (11th Cir. 2023); *id.* at 1336 (noting that officers are not required to believe a suspect's exculpatory statements that conflict with other evidence).  Based on what Doe, Dent, and Rose-Burrell told them, Gee and Silverberg reasonably believed that Doe had a history of suicidal ideation, had come to the Home from a psychiatric hospital, had attempted suicide a few months prior, was supposed to be on daily psychiatric medication, and had threatened to cut himself with a knife shortly before officers arrived at the Home.  They also reasonably believed that Rose-Burrell, as the operator of the home, was responsible for ensuring that Doe had a supply of medication so the caregivers could provide it.  Although the officers received conflicting reports about whether Doe received his medication, they reasonably believed that Doe had not received his psychiatric medication and that is what caused him to threaten suicide on July 3.  The medication charts and medical records that Rose-Burrell says the officers should have reviewed do not refute this reasonable conclusion.  Accordingly, the Court finds that Gee and Silverberg had at least arguable probable cause to pursue the

26

arrest warrants, so they are entitled to summary judgment based on qualified immunity on Rose-Burrell's § 1983 claims.

CONCLUSION

For the reasons set forth above, the Court concludes that Gee and Silverberg are entitled to qualified immunity on the § 1983 Fourth Amendment claims against them.  The Court therefore grants their summary judgment motions as to the § 1983 claims (ECF Nos. 14 & 17).  The Court declines to exercise supplemental jurisdiction over Rose-Burrell's state law claims, and those claims are dismissed without prejudice.  *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction.").  Rose-Burrell's motion for leave to amend (ECF No. 25) is terminated as moot.

IT IS SO ORDERED, this 12th day of March, 2025.

S/Clay D. Land
_____
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA